UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DIAMOND QUALITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CV-114-HAB |
| | ) | |
| DANA LIGHT AXLE PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

After reviewing the parties' summary judgment briefs, the Court ordered additional briefing on a single issue: can one corporate subsidiary tortiously interfere with the contracts and business relationships of another corporate subsidiary when both subsidiaries are owned by the same corporate parent? (ECF No. 64). Those briefs have now been filed.[1] (ECF Nos. 65-67). Because the Court finds that there is no controlling Indiana precedent and that the resolution of the question is outcome-determinative, the Court will certify the question to the Indiana Supreme Court for an answer.

**I.    Factual Background**

This case centers around three subsidiaries of parent company Dana Incorporated: Defendant Dana Light Axle Products, LLC ("Dana Fort Wayne"), Dana AMSA, and Dana ETRAC. The latter two are based in Mexico, and supply parts to Dana Fort Wayne. Dana Fort Wayne then performs precision machining and quality control before shipping the machined parts to other Dana facilities.

---

[1] The Court thanks the parties for their well-researched and well-written briefs.

Plaintiff is an industrial inspection and sorting company. Since 2014, Dana Fort Wayne and its related companies have been among Plaintiff's largest clients, with Plaintiff charging more than $1,500,000.00 for work performed at the Dana Fort Wayne facility.

While Plaintiff performed various jobs for the Dana companies, this case primarily deals with sorting. Basically, Plaintiff would go through non-conforming machined parts and determine whether the nonconformity was the fault of the suppliers—Dana AMSA and ETRAC—or Dana Fort Wayne. Whichever entity was found to be at fault was then responsible for associated costs. Plaintiff was contracted to perform this work by the suppliers and viewed itself as their "eyes and ears."

This arrangement appears to have worked well until mid-2019. It was then that Michelle Evans ("Evans"), Dana Fort Wayne's Quality Manager, made the decision to cut back the use of third-party sorting companies like Plaintiff. Dana Fort Wayne claims that the decision was part of a larger cost-cutting strategy imposed by Dana Incorporated. Plaintiff disputes this explanation, and instead asserts that the decision was made unilaterally by Dana Fort Wayne to push costs for nonconforming parts onto the suppliers.

Whatever the cause, in March and June 2019 Dana Fort Wayne emailed Dana AMSA instructing Dana AMSA to stop sorting activity generally, and the use of Plaintiff specifically. Plaintiff was then informed by Evans in June 2019 that Plaintiff would no longer be permitted to conduct sorting activities at Dana Fort Wayne.

Fast forward to February 2020. Dana Fort Wayne received a shipment of parts from Dana ETRAC that contained several non-conforming parts. Dana Fort Wayne determined that sorting was necessary and began sorting the parts using a different third-party sorting company. Dana ETRAC confirmed the need for sorting via email, copying Plaintiff's owner, Laura Johnson

("Johnson"), and designating Plaintiff as the company to conduct the sorting. Johnson responded, "Yes we will support the inspection. Please call me directly if you have any questions or concerns." Despite Dana ETRAC designating Plaintiff, and despite Johnson's email acceptance, Dana Fort Wayne refused to allow Plaintiff to perform the sort, instead continuing with its selected third-party sorting company.

The next month, Dana AMSA asked Plaintiff to conduct sorting at Dana Fort Wayne. Johnson and another of Plaintiff's employees went to the Dana Fort Wayne facility to conduct the sort. She was denied entry, however, because of COVID-19 protocols. Johnson, accompanied by a security guard, proceeded to Evans' office to demand an explanation for why Plaintiff was being denied access for the sort. Evans explained the COVID restrictions and further advised Johnson that Dana Fort Wayne had hired a different company to perform the sort. Later, Evans sent an email to other senior management officials at Dana Fort Wayne with directions that Plaintiff was not permitted at the Dana Fort Wayne facility "for any reason."

Based on these facts, Plaintiff alleges that Dana Fort Wayne tortiously interfered with Plaintiff's contractual and business relationships. For the contracts, Plaintiff identifies the requests in February and March 2020 by Dana ETRAC and AMSA, respectively, to conduct sorts at the Dana Fort Wayne facility. Plaintiff also points to what it sees as Dana Fort Wayne's ongoing efforts to discourage the use of Plaintiff's services as the basis for its business relationship claim.

**II.     Legal Discussion**

Both parties agree that there is no Indiana authority, either from the Indiana Court of Appeals or Supreme Court, addressing the issue of subsidiary-on-subsidiary tortious interference. (ECF Nos. 65 at 32; 66 at 21). This leaves the Court in the position of making "a prediction of how the Supreme Court of [Indiana] would rule" on the issue. *Straits Fin. LLC v. Ten Sleep Cattle Co.*,

3

(7th Cir. 2018). Having reviewed the relevant authorities and statutes, the Court has little faith in its prophetic abilities. This matter will be certified.

**A.** **Winkler *and the Restatement (Second) of Torts***

Both parties agree that *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228 (Ind. 1994), accurately states the elements of tortious interference in Indiana. Those elements are: (i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of breach of the contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach. *Id*. at 1235 (citing *Daily v. Nau*, 339 N.E.2d 71, 76 n. 6 (Ind. App. 1975)).

Like many such cases, the battle here is on the fourth element: justification. In *Winkler*, the Indiana Supreme Court adopted the Restatement (Second) of Torts § 767. That section suggests seven factors for courts to consider when determining whether interference with a contract is justified:

(a) the nature of the defendant's conduct;

(b) the defendant's motive;

(c) the interests of the plaintiff with which the defendant's conduct interferes;

(d) the interests sought to be advanced by the defendant;

(e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f) the proximity or remoteness of the defendant's conduct to the interference; and

(g) the relations between the parties.

*Winkler*, 638 N.E.2d at 1235 (citing Restatement (Second) of Torts § 767).

If the Court was left just with *Winkler* and the Restatement, it would struggle to find the privilege that Defendant advocates. The comments to the Restatement provide that, where there is

no clear judicial consensus, "consideration must be given to the factors stated in [Section 767]" and "the balancing process must be followed for the individual case." Restatement (Second) of Torts § 767, cmt. j; *see also Winkler*, 638 N.E.2d at 1235 ("the weight to be given to each consideration may differ from case to case depending on the factual circumstances"). Both the Restatement and interpreting Indiana authority, then, require a balancing of the § 767 factors. Applying a privilege to tortiously interfere for one subsidiary against another "elevate[s] the . . . relationship to a super, threshold factor, the presence of which precludes the consideration and weighing of the various Section 767 factors." *Paramount Farms Intl., L.L.C. v. Ventilex B.V.*, 61 N.E.3d 702, 711 (Ohio App. 2016).

The Court adds that, while the Restatement discusses several relationships that may provide a privilege to interfere in business relationships, sister corporations are not among them. For instance, Section 769 provides a qualified privilege to interfere where the tortfeasor has "a financial interest in the business" of the party induced to breach.[2] Restatement (Second) of Torts § 769. While that sounds applicable here, the comments clarify that the "financial interest" contemplated is "an interest in the nature of an investment," specifically calling out "a part owner of the business," "a partner or stockholder," and perhaps a "bondholder or other creditor." *Id*. at cmt. c. While that may describe a parent-subsidiary relationship, it is much less clear that it describes the relationship of two subsidiaries. Other Sections similarly describe privileged relationships, more remote from this case. *See*, *e.g.*, Restatement (Second) of Torts §§ 768 (Competition as Proper or Improper Interference), 770 (Actor Responsible for Welfare of Another), 772 (Advice as Proper or Improper Interference). That the Restatement drafters chose not to

---

[2] The Court notes that this privilege applies only to inducing a third party "not to enter into a prospective contractual relation," and does not apply when the inducement is to breach an existing contract. Restatement (Second) of Torts § 769, cmt. b.

5

include related subsidiaries in the list of entities privileged to interfere is entitled to some deference. *See Doe 1 v. Boone Cty. Prosecutor*, 85 N.E. 3d 902, 909 (Ind. Ct. App. 2017) (omission of churches and other religious structures from definition of "school property" demonstrated that legislature did not intend to include those structures).

So with nothing other than the Restatement as adopted by the Indiana Supreme Court, the Court would find that there is no privilege for one corporate subsidiary to tortiously interfere with the contractual or business relations of its corporate sister. But the Court recognizes that other courts, including state supreme courts, have found at least limited privileges for corporations in the same family. The Court will now address those authorities.

**B.**     ***Parent-Subsidiary Privilege***

Defendant first points to cases from several jurisdictions that hold that a parent company cannot be held liable for interfering with the contracts of its subsidiary. *See*, *e.g.*, *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779 (Tenn. 2000). The logic of those cases largely flows from an analysis of the Sherman Act in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). In holding that a parent corporation cannot conspire with its subsidiary to violate antitrust laws, the Supreme Court stated:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder . . .. [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id*. at 771-72. Recognizing this "unity of interest," Courts in Texas and Tennessee have held that there is a "privilege of a parent corporation to interfere in its wholly-owned subsidiary's contractual relations." *Waste Conversion*, 33 S.W.3d at 781.

Defendant's argument from the parent-subsidiary cases is a straightforward application of the transitive property—if a (subsidiary 1) = b (the parent), and if b = c (subsidiary 2), then a = c. (ECF No. 65 at 20). Thus, Defendant argues that sister corporations are the "same entity," and should not be subject to liability for tortious interference. (*Id*.).

Whether the transitive property works as a matter of math or logic, the Court is not convinced its works as a matter of corporate law. First, this case shows the factual problem of equating one corporate subsidiary with each of its siblings. While Plaintiff may have performed other work, the work that brings the parties before the Court involved allocating charge-back costs between the Dana subsidiaries. Indeed, Plaintiff's theory is that Dana Fort Wayne wanted Plaintiff off the sorting jobs to allocate more of those costs to Dana ETRAC and Dana AMSA. While that allocation may not have mattered to Dana Incorporated, which benefitted or not from the combined profits and losses of all its subsidiaries, it appears to have mattered very much to the subsidiaries. This is at least one example of subsidiaries not having a "unity of interest."

Second, the Restatement distinguishes between parents and subsidiaries. As discussed above, Section 769 contains a qualified privilege where the tortfeasor has an investment interest in the part induced to breach. The Restatement, then, contemplates a privilege for a parent corporation—that necessarily has an investment interest in its subsidiaries—but no similar privilege for sister corporations.

But most importantly, equating subsidiaries seems to ignore basic principles of corporate governance. Under Indiana law, a corporation is a separate legal entity. *Winkler*, 638 N.E.2d at

1231-32. "Thus, we recognize a subsidiary and its parent corporation-shareholder as separate legal entities." *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind. 1995). While Indiana recognizes limited instances where the corporate form can be disregarded to prevent fraud and injustice to third parties, the Indiana Supreme Court has stated that it "perceive[s] little likelihood that equity will ever require us to pierce the corporate veil to protect the same party that erected it. It was, after all, defendant that chose to structure itself in its present multi-corporate form." *Id*.

Defensive piercing of the corporate veil is precisely what a privilege to interfere would permit here. Dana Incorporated chose to incorporate its subsidiaries as separate entities. That choice is to be respected, subject to protection of third parties. But Dana Fort Wayne wants the Court to ignore that choice to protect itself, something the Indiana Supreme Court has said there is "little likelihood" it would ever endorse. The Court sees little reason to believe that this case, or this legal issue, would be the exception.

C.  *Expansive Definition of Third Person*

Defendant's other cases rely on an expansive view of who is a "third person" to a contract. The Restatement uses the term "third person" throughout the chapter on tortious interference to describe the party induced to breach. Relying primarily on Georgia law, Defendant argues that third person should be understood to mean "stranger," a definition which "protects all parties to an interwoven contractual arrangement from liability for tortious interference with any of the other contracts or business relationships." (ECF No. 65 at 24) (citing *Atlanta Mkt. Mgmt. Co. v. McLane*, 503 S.E.2d 278 (Ga. 1998)).

Both parties largely agree that Indiana has not comprehensively defined who qualifies as a third party or third person to a contract for tortious interference claims. The Court agrees. Indiana courts are clear that a party cannot interfere with its own contracts. *Trail v. Boys and Girls Clubs*

*of Nw. Ind.*, 845 N.E.2d 130, 138 (Ind. 2006). But the contours of who is a party to a contract have largely been addressed only in the context of agency-principal relationships. *See Trail*, 845 N.E.2d at 139-41; *Meridian Sec. Ins. v. Hoffman Adjustment Co.*, 933 N.E.2d 7 (Ind. Ct. App. 2010). Those cases are of little help to the Court.

While Indiana authorities are less than helpful, the Court believes that the Restatement takes a more limited view than the one advanced by Defendant. As noted above, the Restatement uses the term "third person" throughout the relevant chapter. And the third persons discussed are hardly "strangers" to the putative tortfeasors: they are wholly owned subsidiaries (§ 769), children, congregants, and clients (§§ 770, 772), and others in a close relationship with the person or party inducing the breach. Yet, in each of these cases, the privilege granted by the Restatement is qualified *and limited to prospective contractual relationships*. Non-strangers could be liable for tortious breach of contract under the Restatement, limiting the so-called "stranger doctrine" in those states, like Indiana, that have adopted the Restatement.

### III. Conclusion

Indiana Appellate Rule 64 states that a district court "may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling precedent." The Court finds that Plaintiff's claims fall within this Rule. The Court cannot determine whether Defendant is liable for tortious interference with contractual and business relationships without knowing whether such a claim exists given the corporate relationships here. And even if a claim does exist, the Court cannot meaningfully apply it to the facts here without knowing the claim's scope. To resolve these issues, this court will certify the question to the Indiana Supreme Court.

9

The Justices of the Indiana Supreme Court may reformulate this question if they feel that course is appropriate. Nothing in this certification is intended to limit the scope of their inquiry.

For these reasons, the Court hereby CERTIFIES the following question to the Indiana Supreme Court: "May a plaintiff bring a claim for tortious interference with contractual and business relationships when the party induced to breach is a subsidiary of the same corporate parent as the defendant? If so, what is the scope of those claims, and what factors should the Court consider in determining liability?" Under Ind. App. R. 64(B), the Clerk is ORDERED to provide the Indiana Supreme Court with copies of: (1) this Opinion and Order; (2) the docket, including the names of the parties and their counsel; (3) Plaintiffs' Complaint (ECF No. 5); (4) Defendants' Answer (ECF No. 16); and (5) the parties' briefs on the motion for summary judgment (ECF Nos. 33, 34, 35, 42-56, 62, 63, 65-67). All proceedings on Defendants' motion for summary judgment (ECF No. 32) are STAYED pending the certification request.

SO ORDERED on February 29, 2024.

s/Holly A. Brady  
CHIEF JUDGE HOLLY A. BRADY  
UNITED STATES DISTRICT COURT